## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### PARKERSBURG

In the Matter of the Complaint
of B & H Towing, Inc., as Bareboat
Charterer/Owner *pro hac vice* of the
M/V JON J. STRONG, Official No.
500419; and AEP MEMCO LLC, as the
Owner of the M/V JON J. STRONG,          Case No. 6:05-cv-00233
Official No. 500419; and American
Electric Power Company, Inc., and
AEP Resources, Inc., as alleged
Owners and/or Operators of the
M/V JON J. STRONG, Official No.
500419, for Exoneration from or
Limitation of Liability

### MEMORANDUM OPINION AND ORDER

Pending before the court is a Motion to Compel the United States of America to Properly Respond to the First Set of Interrogatories and Request for Production from AEP Resources, Inc., filed April 27, 2006. (Docket Sheet Document # 517.) The United States responded on May 3, 2006 (# 522), and AEP Resources, Inc. ("AEP") replied on May 11, 2006. (# 523.) In addition, by letter dated May 24, 2006, copied to counsel of record, AEP further clarified the issues that remain in dispute.[1] The court conducted a hearing on June 19, 2006.

In its Motion, AEP seeks an order compelling the United States to fully and completely respond to AEP's First Set of Interrogatories and Request for Production of Documents from AEP Resources, Inc., served on February 14, 2006. In particular, AEP

_____

[1] The letter is attached as Court's Exhibit A.

seeks an order compelling the United States' responses to interrogatory numbers 1, 2 and 6 and request for production numbers 1, 2, 4, 7 and 8.  In its letter to the court dated May 24, 2006, AEP further indicates that request for production numbers 3, 5 and 9 are in dispute.

In its Complaint, AEP, pursuant to 45 U.S.C. app. §§ 183, et seq., seeks exoneration or limitation of liability for damages and losses occasioned by an incident involving the M/V JON J. STRONG (the "STRONG") which occurred on January 6, 2005.  The parties assert differing sets of facts leading up to the loss, but agree that the STRONG stalled, was caught by a current, and that its tow broke apart and drifted down onto and through the Belleville Locks and Dam.  Approximately 170 claims were filed by residential property owners, the United States of America (the "United States") and various other governmental and/or commercial interests.  Also, AEP has asserted a counter-claim against the United States alleging that the United States, acting through the United States Army Corps of Engineers (the "Corps"), was negligent with respect to the maintenance and operation of the Belleville Locks and Dam.

In its Motion, AEP describes in detail the structure and functioning of the Belleville Locks and Dam, the significance of accumulations of drift, the river conditions around the time of the incident in question on January 6, 2005, the Corps' employees who were working during those times, and a description of the incident

2

in question, including the installation of bulkheads.  (# 518, pp. 3-11.)

AEP contends that the January 6, 2005, incident

was caused or contributed to by the [Corps'] negligent failure to properly operate the lock facility in accordance with established practices, policies, and procedures.  AEP Resources (and other Petitioners) further contend that the lock personnel negligently created a hazardous drift condition at the lock and then failed to correct the situation or to warn Captain Baker [who captained the STRONG on January 6, 2005] of its existence.  Two of the significant issues in dispute relate to the practices or policies of Belleville concerning when the bulkhead system should have been installed and who was in charge.  It is the United States' position ... that the installation of the bulkheads is solely within the discretion of the Lockmaster. Petitioners contend, however, that whatever discretion the lockmaster may have, it is limited in that the bulkheads must be installed prior to the lock losing the ability to effectively pass drift using the culvert valve method.

(# 518, p. 12.)

Petitioners and the United States dispute whether actions of Corps' personnel on and around January 6, 2005, amounted to an exercise of discretionary function, for which there is no liability, or whether actions of Corps' personnel amounted to simple negligence that does not enjoy the protection of the discretionary function exception to liability.  According to AEP, "[t]he issue of negligence necessitates inquiry into such matters as the frequency of heavy drift in the past, under what circumstances it occurs, how the problem has been dealt with by the lock personnel and by vessels using the lock, and the experience of

3

the lock personnel on duty."  (# 518, p. 12.)  As set forth below, AEP propounded discovery to that end, and the United States has objected to this discovery on a variety of grounds.

Interrogatory Number 1

> **INTERROGATORY NO. 1:**  In the five-year period preceding January 6, 2005, for each occasion on which the bulkheads (as defined *supra*) were installed or placed in the river at the Dam to be used for passing drift or debris please state:
> a.   The date installation was directed or "ordered" and the date installation was completed (if different) ("Installation Date(s)");
> b. The identity of the person ordering the installation;
> c.  The identity of the person(s) performing the installation;
> d. The number of bulkheads installed, the total time it took to install ("Total Time"), and the amount of Total Time that was spent in connection with any repairs, maintenance, or delays due to mechanical conditions or problems with either the bulkhead crane or the bulkheads themselves;
> e. Identify all records which show the river conditions, including gauge readings, vessel lockages, drift/debris passage, and the number of tainter gate feet open on the Installation Date(s); for the four days preceding the Installation Date(s); and for the four days after the Installation Date(s); and
> f. Identify all employees who worked at the Dam on the Installation Date, providing the salary or grade and shift for each.

(# 517, Exhibit B.)

In response, the United States objected on the grounds that the information sought in this interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  The United States further stated that it produced a Rule 30(b)(6) witness who testified that there is no preset trigger for when the Lockmaster decides, if at all, to

4

install the bulkheads and that instead, this decision is committed to the discretion of the Lockmaster. In addition, each high water event is different.[2]

In its Motion, AEP argues that the information requested in interrogatory number 1 is relevant and "critical to determine whether there is, in fact, an established practice or procedure that was not followed on this occasion" and "the appropriate standard of care in regard to foreseeability, duty/risk analysis and the question of proximate cause." (# 518, p. 13.)

In its response to AEP's Motion, the United States further argues that it offered to stipulate to the facts that (1) the Lockmaster usually orders bulkheads to be installed so that drift may be passed when needed and (2) the bulkheads were being set when the STRONG approached the Belleville Locks and Dam. The United States asserts that the information sought by AEP in this interrogatory is therefore irrelevant in light of the proposed stipulation and also, is unduly burdensome. The United States estimates it would take an employee working full-time, seven to ten working days to complete the review. (# 522, p. 5.)

In reply, AEP argues that in a supplemental response to discovery, the United States asserts that Captain Baker failed to consider the likelihood of drift upstream when observing drift

---

[2] At the request of the court, AEP provided copies of the interrogatories and requests and the United States' responses. They are attached hereto as Court's Exhibit B.

within the locking chamber.  AEP asserts that the buildup of drift encountered by Captain Baker in the upstream approach to the Belleville Locks and Dam and the failure of the Corps to timely set bulkheads to prevent the accumulation of drift are inextricably linked.  AEP avers that the United States cannot argue on the one hand that drift contributed to the incident at issue and that AEP cannot undertake discovery regarding the failure to timely employ bulkheads.  In addition, AEP disputes whether the Lockmaster's decision to set bulkheads is entirely discretionary.  (# 523, p. 3.)  Finally, AEP challenges the United States' claim of burdensomeness, asserting instead that "[h]igh water events requiring the installation of bulkheads occur only [a] few times each year, if at all."  (# 523, p. 10.)

At the hearing, AEP argued that it seeks the information requested in interrogatory number 1 because it wants underlying information from which the United States prepared certain summaries known as detail lockage reports.  AEP asserts that there are discrepancies between the detail lockage reports.  The United States disputes this and explains that the information on the detail lockage reports was as originally entered or corrected as indicated in sheets attached to the detail lockage reports.  The United States also explained that the detail lockage reports do not contain information about water levels, but this information is on the OMNI system and it may be possible to write a program to

6

extract this information.  In addition, the United States indicated there are handwritten daily logs recording information such as whether the bulkheads were set and water levels.  The Corps also maintains a website that contains information about water levels. Counsel for the United States was unsure about whether this information from the website is maintained in a report or other form.  AEP noted the presence of a hydraulics daily report, which shows readings at the upper and lower gauges at various times, and requested that this information be produced.  Finally, the United States estimated bulkheads are installed less than six times per year on average.

The court finds that the information sought in interrogatory number 1 is relevant as that term is defined in Rule 26(b)(1) of the Federal Rules of Civil Procedure and not unduly burdensome given the number of times bulkheads were likely installed during this time period.  The information sought in the interrogatory, including its subparts, is relevant to the issue of the practices and policies of Belleville personnel concerning installation of the bulkhead system.  Regarding subpart (e), the United States will produce all detail lockage reports, handwritten lock logs, and the hydraulics daily reports for the time period requested in subpart (e) of the interrogatory.  If this does not provide the information sought in subpart (e), AEP may refile its Motion.

Interrogatory Number 2

>    **INTERROGATORY NO. 2:**      Please identify the individuals
>    in the chain of command within (1) the Huntington
>    District Corps of Engineers, (2) the Great Lakes and Ohio
>    River Division of the United States Army Corps of
>    Engineers in Cincinnati, Ohio, and (3) the USCOE
>    Headquarters in Washington, D.C., who had supervisory
>    authority over the Lockmaster, Acting Lockmaster, or
>    senior shift leader at the Dam each day from January 1 to
>    January 7, 2005, and state the work schedule for each
>    such individual in the chain of command during that
>    period of time.  For any such supervisor who was off work
>    for holiday leave, vacation, annual leave, sick leave,
>    personal leave, or otherwise during any part of the
>    period from January 1, 2005, to and including January 7,
>    2005,  identify the individual and please indicate the
>    day or days such individual did not report to work and
>    the reason for not reporting.

(# 517, Exhibit B.)

In response, the United States objected on the grounds that
the information sought in this interrogatory is overly broad,
unduly burdensome and not reasonably calculated to lead to the
discovery of admissible evidence.  In addition, the United States
asserted that through depositions, it has already identified the
chain of command for personnel assigned to the Belleville Locks and
Dam.  In addition, the United States asserted that due to
accessibility via telephone, whether supervisory personnel were in
their offices is irrelevant and that the reasons why the
supervisory personnel were not in their offices is contained in a
"system of records" protected from disclosure under the Privacy Act
of 1974, 5 U.S.C. § 552a.  Without waiving objections, the United
States identified the various supervisors, but did not provide the

8

work schedule for each such individual during this time period or, if such supervisor was off work, which days the individual was off work and the reason for not reporting.  (Court's Exhibit B.)

AEP argues in its Motion that it does not seek documents responsive to this interrogatory, rather it seeks a statement of the supervisory personnel's work schedule and, if they were not scheduled to work, the reason why.  AEP disputes whether such information is protected by the Privacy Act, particularly in the context of this civil action wherein the United States is a party. (# 518, p. 14.)

In its response to AEP's Motion, the United States asserts it has already provided logs and duty roster summaries and each of the Belleville Locks and Dam employees deposed have testified to their work schedules and whereabouts relative to the incident.   In addition, the United States continues to assert that the information is protected by the Privacy Act.  Finally, the United States acknowledges that while AEP has argued that supervisory personnel within the Huntington District and higher up in the chain of command may have been potentially unavailable had employees of the Belleville Locks and Dam tried to call them, "[n]obody tried to call the Lock Master or Assistant Lock Master, let alone supervisory personnel at the Huntington District, prior to the incident.  Thus, whether those persons were at their desks, in their offices, on vacation, in the hospital, or elsewhere is

completely irrelevant." (# 522, p. 6.)

The court finds that the information sought in interrogatory number 2 is relevant as that term is defined in Rule 26(b)(1) of the Federal Rules of Civil Procedure.  In determining the practices and policies of Belleville personnel concerning installation of the bulkhead system, the involvement and knowledge of supervisors within the chain of command during the time period of January 1 through 7, 2005, is relevant.  The court is sensitive to the concerns of the United States related to the Privacy Act, but the Privacy Act, 5 U.S.C. § 552a(b)(11), permits disclosure of information by court order.  See Laxalt v. McClatchy, 809 F.2d 885, 888-89 (D.C. Cir. 1987) (rejecting the argument that the "court order" exception under the Privacy Act prohibited any discovery absent a showing of actual need, rather than mere relevance); Marks v. Global Mortgage Group, Inc., 218 F.R.D. 492, 496 (S.D. W. Va. 2003) (citing Laxalt).  While the court has instructed the United States to redact private personal information such as social security numbers, home phone numbers and addresses and other private information, the information sought in this interrogatory is relevant and must be disclosed.

Interrogatory Number 6

> **INTERROGATORY NO. 6:**  For the period between January 1, 2005, and December 31, 2005, state the date and time, identify the participants and describe in detail the content of all oral communications regarding the passage of drift, the setting of bulkheads and/or the operation of the Auxiliary crane or the bulkhead crane at the

10

Belleville Locks and Dam participated in by any USCOE officers, employees and supervisors whose duty locations were located at the following offices and facilities of the USCOE:
(a)  Belleville Locks and Dams;
(b)    Huntington District Office, Huntington, West Virginia;
(c)  Great Lakes and Ohio Division Office, Cincinnati, Ohio;  and
(d)  Headquarters, Washington, D.C.

(# 517, Exhibit B.)

In response, the United States objected on the grounds that the information sought in this interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  The United States further asserted that fourteen witnesses, including Rule 30(b)(6) witnesses for the setting of bulkheads and maintenance of equipment, have testified regarding the passage of drift and operation of the bulkhead crane and piggy back crane at the Belleville Locks and Dam during the period from January 1 through 6, 2005.  According to the United States "there were no discussions regarding either the setting of bulkheads and maintenance of equipment <u>external</u> to that facility during the relevant time frame." (Court's Exhibit B.)

In its Motion, AEP argues that the United States has not answered the interrogatory in full.  AEP asserts that the United States arbitrarily defined the relevant time period as between January 1 and 6, 2005, when the interrogatory sought information from January 1, 2005, through December 31, 2005.  In addition, it failed to answer the question of what oral communications occurred

11

between Belleville personnel and personnel in the chain of command above Belleville after the incident relating specifically to the passage of drift, the setting of bulkheads and/or the operation of the cranes at Belleville, whether in the time immediately before the incident or in the year that followed.  (# 518, p. 15.)

In its response to AEP's Motion, the United States points out that after the parties conferred on April 21, 2006, regarding this discovery dispute, the United States offered to make further inquiry and, as a result of that inquiry, has not identified any additional information responsive to this interrogatory.  (# 522, p. 8.)

At the hearing, the United States explained that in making further inquiry, it had asked about oral communications after the incident and learned that all had been disclosed.  AEP stated that in depositions, one supervisor reported one phone call with the Lockmaster on duty sometime after the incident, though it did not include a discussion about bulkheads.  With the exception of two individuals who were on duty and other supervisors in the Huntington office, all individuals have been deposed.  AEP represents that having this information could narrow the number of remaining depositions to be taken and/or their scope.

The court finds that the information sought in interrogatory number 6 is relevant as that term is defined in Rule 26(b)(1) of the Federal Rules of Civil Procedure.  With an incident such as the

one that occurred at Belleville, there is a high probability of discussions about the incident.  In addition, the court finds the United States' response difficult to understand.  Thus, the court finds AEP's Motion with respect to this interrogatory should be granted.  The court finds that the United States should serve a verified supplemental response describing those oral communications after the incident through December 31, 2005.  In addition, the supplemental response should clarify what inquiry the United States made to obtain its response.

Request for Production Number 1

> **REQUEST NO. 1.** Please produce copies of all documents identified in the United States' Answers to AEP Resources, Inc.'s First Set of Interrogatories to the United States or relied upon in preparing the United States' Answers to AEP Resources, Inc.'s First Set of Interrogatories to the United States.

(# 517, Exhibit B.)

In response, the United States stated that there are no documents identified in response to AEP's interrogatories, apart from those documents previously provided or provided with these responses.  (Court's Exhibit B.)

In its Motion, AEP asserts that to the extent the United States is compelled to respond to the interrogatories that are the subject of AEP's Motion, the United States should be compelled to respond to this request as well.  (# 518, p. 16.)

In response, the United States states that it has already committed to produce any documents identified which AEP is entitled

13

to receive.  (# 522, p. 8.)

Insofar as the court has ordered certain documents be produced, AEP's Motion with respect to request number 1 is granted.

Request for Production Number 2

> **REQUEST NO. 2.** Please produce the personnel files for the following individuals and, to the extent not previously produced, the job description for each as of January 5, 2005:
> a.   Joseph D. Marcinko;
> b.   Charles I. Mugrage;
> c.   Carl R. Robinson:
> d.   Tommy J. Reed;
> e.   Terrance A. Smith;
> f.   Wayne Barnhart;
> g.   Robert Miller;
> h.   Karla Smith;
> i.   Jeffrey R. Ankrom;
> j.   Charles M. Burns;
> k.   Ronald C. Lowe;
> l.   Jonathan S. Miller; and
> m.   Ann S. Milliron

(# 517, Exhibit B.)

In response, the United States objected on the grounds that the documents sought are overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  In addition, the United States asserted that the requested documents are contained in a "system of records" protected from disclosure by the Privacy Act.  Without waiving its objections, the United States provided position descriptions. (Court's Exhibit B.)

In its Motion, AEP argues that it should have access to the personnel files of the Belleville Locks and Dam personnel to

"obtain records of training, performance evaluations, reprimands, warnings, etc. pertinent to their performance and capabilities in general and in respect to this incident." (# 518, p. 16.) AEP asserts that these matters are relevant as to the standard of care and the Corps' adherence to it. (# 518, p. 17.)

In response to the Motion, the United States argues that AEP has deposed nearly every employee of the Belleville Locks and Dam and has had every opportunity to inquire about this information. In addition, AEP deposed both the lead mechanic and the Lock Master, the Assistant Lock Master, and the Shift Responsible Persons (Shift Leaders), which afforded AEP the opportunity to obtain the assessments of multiple supervisors as to any given employee. (# 522, p. 8.) Finally, the United States asserts that such documents are protected by the Privacy Act and that if the court should order disclosure of such records, it should first review them in camera. (# 522, p. 9.)

In Rollins v. Barlow, 188 F. Supp.2d 660, 661-62 (W. Va. 2002), this court considered the issue of whether personnel files of West Virginia State troopers who were to be called as experts in an excessive force case should be produced. While Rollins differs from this case with respect to the reasons for seeking the personnel files, Rollins is instructive because this court found a "strong public interest in protecting the privacy rights of police officers in their own personnel records ...." Id. at 663.

Certainly, this principle is no different with respect to the personnel files of federal employees.   See Cason v. Builders FirstSource-Southeast Group, Inc., 159 F. Supp.2d 242, 247 (W.D. N.C. 2001) (finding there is a strong public interest against public disclosure of personnel files).   "[T]he very act of disclosing an employee's sensitive and personal data is a highly, and frequently, an unnecessarily intrusive act -- whether or not that disclosure is governed by the terms of a Confidentiality Order."  Raddatz v. Standard Register Co., 177 F.R.D. 446, 447-48 (D. Minn. 1997).

Thus, "before a Court compels the production of non-party personnel files, it should first be satisfied that the information in those files is, indeed, relevant."  Id. at 448.   In addition, "production of the files in their entirety should not be ordered when the relevant information may be obtained by resort to less intrusive means of discovery."  Id.; see also Blount v. Wake Elec. Membership Corp., 162 F.R.D. 102, 106 (E.D. N.C. 1993) (in a negligence case, court required that information in personnel files of a named defendant must be clearly relevant and the need for discovery must be compelling because the information sought is not otherwise readily obtainable).

The court finds that performance related records contained in the personnel files of the above individuals, all of whom are directly connected to this incident, are relevant as that term is

defined in Rule 26(b)(1) of the Federal Rules of Civil Procedure
and go directly to the issue of the Corps' alleged negligence
related to this incident.  In addition, the court finds that the
information may not be obtained by resort to less intrusive means.
Although many, if not all of these individuals, have been deposed
and presumably asked about performance issues, AEP should have the
opportunity to verify this information through access to the actual
records.  The United States is instructed to redact any private
personal information such as social security numbers, home phone
numbers and addresses and other private information.  If the
parties encounter problems in making this production and determine
there are documents that must be submitted <u>in camera</u>, they should
contact the court.

<u>Request for Production Number 3</u>

> **REQUEST NO. 3.** Please produce all records which relate
> to or reflect the locking of vessels or the passing of
> drift at the Dam between January 1-12, 2005, including,
> but not limited to, any records that relate to or
> reflect any delay in locking vessels resulting from any
> accumulation or build-up of drift/debris in the lock
> area from the upstream lock gates to the upstream end
> of the long wall (as those terms were used in the
> depositions of the USCOE employees taken in this case)
> and all records that relate to each individual locking
> of either a vessel or drift/debris.

(# 517, Exhibit B.)

In response, the United States objected on the grounds that
the documents sought are overly broad, unduly burdensome and not
reasonably calculated to lead to the discovery of admissible

evidence.  The United States asserted that the STRONG "had already 'locked through' to the upper pool at Belleville, stopped at the end of the upstream long wall, had cleared all but five feet of drift from the head of its tow, had released its look outs from their locking stations, and had backed down to clear drift (if any) from beneath the towboat <u>all before</u> pushing out from the upper approach and into the high waters and swift currents of the Ohio River."  (Court's Exhibit B.)

In its letter dated May 24, 2006, AEP states that in response to request number 3, the United States provided a detail lockage report, which is a "summary list of the 89 lockages of vessels and drift or lock stoppages for the period between January 1, 2005, and January 12, 2005, and then unilaterally limited its response to the request to include documents reflecting the individual input screens for just seven lock stoppages and just three vessel lockages ....  Previously, the United States provided copies of [other lock stoppages].  The 'Detail Lockage Report' which purports to contain a list of all lockages and lock stoppages between January 1, 2005, and January 12, 2005, is attached hereto as Exhibit 1 and was produced in response to Request No. 3."  (Court's Exhibit A, p. 2.)

AEP further asserts in its letter that inconsistencies in "different types of records of the same event and multiple versions of the same record of an event create questions regarding the

accuracy and legitimacy of a recordkeeping system and/or the credibility and motives of the record keepers." (Court's Exhibit A, p. 2.) AEP indicates that it seeks "printouts of the original and all modified versions of the input screens for all 89 lockage and lock stoppage events in the OMNI system cataloged in the Detail Lockage Report for the period from January 1, 2005, to January 12, 2005. In the event a lockage report was completely erased from the system, a record of any such erasure would also be relevant for discovery." (Court's Exhibit A, p. 3.)

In its letter dated May 24, 2006, AEP represents that the United States filed a supplemental response in which it indicated it had no other responsive records, but that the United States may be able to produce them from the OMNI computer system. As of May 24, 2006, there had been no supplemental production. (Court's Exhibit A.)

At the hearing, the United States explained that the OMNI system overwrites itself each time an entry is made on the system and that entries have been made to try to accurately reflect the locking of vessels and passing of drift during the time requested. There are work summaries, called vessel work area sheets, and they show when an entry on the detail lockage report was modified or saved. AEP stated it seeks copies of all vessel work area sheets, a current detail lockage report and email transmissions related to any corrections on the OMNI system. Counsel for the United States

confirmed the recent deposition testimony of a Corps' employee who testified about the existence of emails related to changes made on the OMNI system.

The court finds that the documents sought in request number 3 are relevant as that term is defined in Rule 26(b)(1) of the Federal Rules of Civil Procedure.  AEP should have the opportunity to verify the information contained in the detail lockage report, to the extent it can be verified.  The court finds that the United States should produce a current detail lockage report for the period from January 1 through 12, 2005, all related vessel work area sheets, and email transmissions related to any corrections on the OMNI system.

<u>Request for Production Number 4</u>

> **REQUEST NO. 4.** For each of the Installation Dates identified in the US' Answer to Interrogatory No. 1 of AEP Resources Inc.'s First Set of Interrogatories to the United States, please produce those records which relate to or reflect on:
> a.   The four-day forecasted or projected river stages at the Dam for each day starting four days prior to the Installation Date(s) and ending four days after the Installation Date(s);
> b.   The hourly river and Dam conditions for each date, including the daily lock or lockmaster's log;
> c.   The daily logs for the Willow Island Lock and Dam and/or the Racine Lock and Dam and/or any other records prepared or maintained at the Willow Island Lock and Dam or Racine Lock and Dam relating to or reflecting the passing of drift at that lock and dam;

(# 517, Exhibit B.)

In response, the United States objected on the grounds that the documents sought are overly broad, unduly burdensome and not

reasonably calculated to lead to the discovery of admissible evidence. The United States further asserted that it had already offered a Rule 30(b)(6) witness who testified that the decision to install the bulkheads is committed to the discretion of the Lockmaster and that each high water event is different. (Court's Exhibit B.)

In its Motion, AEP refers to its argument made in support of its motion to compel the United States' full response to interrogatory number 1. AEP argues that "the question of whether there is a procedure requiring that the bulkheads be installed prior to the loss of the normal ability to pass drift at the lock is an important question of disputed fact, and the documentation regarding the river and drift conditions under which the bulkheads have been set on other occasions at the Belleville lock is highly relevant to the question of the Corps' negligence."
(# 518, p. 17.)

In response to AEP's Motion, the United States again asserts that there is no dispute that there are "no preset triggers to when the Lock Master may decide to order the installation of bulkheads and each witness deposed testified that each flood is 'different.'"
(# 522, p. 9.)

At the hearing, the United States argued that the Lockmaster at Belleville and former and current supervisors testified at deposition that events at Willow Island Lock and Dam, located

upstream from Belleville, did not factor into their decision making.  In addition, neither Racine, which is located downstream, nor Willow Island uses the same bulkhead system.  The United States indicated it believed Racine and Willow Island used the same handwritten lock log.

The court finds that the documents sought in request number 4(a) and (b) are relevant as that term is defined in Rule 26(b)(1) of the Federal Rules of Civil Procedure and for the same reasons explained in the court's ruling related to interrogatory number 1. Regarding 4(c), the court finds that for those dates in 2004 and 2005, when bulkheads were installed at Belleville, the United States should produce handwritten daily lock logs for those same dates at the Willow Island and Racine dams.

Request for Production Number 5

> **REQUEST NO. 5.** Please produce the daily work schedule
> for January 1-7, 2005, for:
> a.   Dominico Chanesi;
> b.   Dale Smith;
> c.   Jason Hawk; and
> d.   The Chief of the Navigation Branch, Huntington
> District Corps of Engineers, from January 1-7, 2005,
> and for any individual serving as the acting Chief of
> the Navigation Branch, Huntington District Corps of
> Engineers, during that period of time.

(# 517, Exhibit B.)

In response, the United States objected on the grounds that whether individuals were in their offices is irrelevant in light of accessibility via telephone.  In addition, such documents are contained in a "system of records" protected from disclosure under

22

the Privacy Act. (Court's Exhibit B.)

In its Motion, AEP moves to compel this request, but makes no argument specifically related thereto.  (# 518.)

In its response, the United States states it assumes this request is no longer in issue.  (# 522.)

In its letter dated May 24, 2006, AEP states that this request remains in dispute and has been fully briefed.  Presumably, AEP is referring to argument made related to interrogatory number 2, which sought work schedule information for certain employees.  (Court's Exhibit A.)

The court finds that the documents sought in request number 5 are relevant as that term is defined in Rule 26(b)(1) of the Federal Rules of Civil Procedure and go directly to the issue of the Corps' alleged negligence related to this incident.

Request for Production Number 7

> **REQUEST NO. 7.** Please produce any and all records (such as time cards) that relate to or reflect on the time that each Dam employee reported for work at the Dam and the time that each departed from work for the period from January 3, 2005, to January 7, 2005.

(# 517, Exhibit B.)

In response, the United States objected on the grounds that the documents sought are overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  In addition, the United States asserted that the time of attendance at the dam for persons not on duty the day of the

23

incident has no relevance and for persons on duty, that information has already been obtained through depositions.  Finally, the United States asserted that such documents are contained in a "system of records" protected by the Privacy Act.  (Court's Exhibit B.)

In its Motion, AEP asserts that it is entitled to investigate whether the contemporaneous business records confirm or refute the witnesses' testimony.  "Exactly who was on duty and when is a very important question in this case and the requested records are directly relevant to this issue."  (# 518, p. 17.)

In response to the Motion, the United States asserts that it provided a roster, refined over the course of the depositions of nearly every employee at the Belleville Locks and Dam, and, as such, there is no question as to who was on duty at the time of incident.  (# 522, p. 10.)

In reply, AEP notes that at least one employee, Mr. Mugrage, is shown on the duty roster as being off on leave on January 4, 2005, but in fact, Mr. Mugrage worked that day for approximately four hours, though he could not identify when he worked.  As a result of this discrepancy, AEP requests the actual records.  (# 523, p. 11.)

The court finds that the documents sought in request number 7 are relevant as that term is defined in Rule 26(b)(1) of the Federal Rules of Civil Procedure and go directly to the issue of the Corps' alleged negligence related to this incident.

24

Request for Production Number 8

> **REQUEST No. 8.**  For the period between January 1, 2004
> and December 31, 2005, please produce all documents
> which relate to or reflect written, oral or electronic
> communications between and among USCOE Belleville Locks
> and Dam employees and/or supervisors regarding the
> setting of bulkheads, the passage of drift and/or the
> operation of the auxiliary crane or the bulkhead crane
> at the Dam.

(# 517, Exhibit B.)

In response, the United States objected on the grounds that
the documents sought are overly broad, unduly burdensome and not
reasonably calculated to lead to the discovery of admissible
evidence.  In addition, the United States objected to the expansive
time period covered in the request, arguing instead that the
relevant time period should be January 1 through 6, 2005.  Finally,
the United States stated that immediately subsequent to the
incident, the Lockmaster forwarded an Accident Report to his
supervisor, which been produced.  However, "the contents of the
Lockmaster's oral inquiries at the facility and reports up the
chain of command are protected by Rule 26(b)(3).  Because AEP has
deposed nearly every employee of Belleville Locks and Dam, AEP
cannot demonstrate undue hardship in obtaining the requested
information through other means."  (Court's Exhibit B.)

In its Motion, AEP objects to the United States' limiting of
the relevant time frame to January 1 through 6, 2005.  As to
whether the documents are subject to protection under the work
product doctrine, AEP asserts that no privilege log has been

25

produced.  (# 518, p. 18.)

In response, the United States points out that the primary means of communication at Belleville Locks and Dam was over the telephone or face-to-face and that the Lockmaster had no recollection of responsive documents other than those produced. The United States represented that it looked again, but found no additional responsive documents.   Finally, the United States asserts that it provided AEP with a privilege log on April 25, 2006. (# 522, p. 10.)

AEP does not address this issue in its reply.  (# 523.)

At the hearing, the United States stated that it made further inquiry and confirmed that there are no documents responsive to this request for the entire time period.  The United States agreed to formally supplement its response to this request.

Request for Production Number 9

> **REQUEST NO. 9.** For the period between January 1, 2004 and December 31, 2005, please produce all documents which relate to or reflect written, oral or electronic communications between USCOE officers, employees and/or supervisors at the Huntington District Office, on the one hand, and, on the other hand, USCOE employees and/or supervisors at the Dam regarding the setting of bulkheads, the passage of drift and/or the operation of the auxiliary crane or the bulkhead crane at the Dam.

(# 517, Exhibit B.)

In response, the United States incorporated its objections from request for production number 8 and, without waiving its objections, stated that there are no responsive documents.

26

(Court's Exhibit B.)

In its Motion, AEP does not specifically address request for production number 9.

In response, the United States states it assumes this request is no longer in issue.  (# 522.)

AEP does not address this request for production in its reply. (# 523.)

In its letter dated May 24, 2006, AEP states that the request for production remains in dispute.  In addition, AEP notes that the United States agreed to take another look, but no supplemental response or privilege log has been forthcoming.  (Court's Exhibit A.)

At the hearing, the United States stated that it made further inquiry and confirmed that there are no documents responsive to this request for the entire time period.  The United States agreed to formally supplement its response to this request.

Accordingly, it is hereby **ORDERED** that the Motion to Compel the United States of America to Properly Respond to the First Set of Interrogatories and Request for Production from AEP Resources, Inc. is **GRANTED** with limitations as set forth more fully above. The parties shall bear their own costs.

The Clerk is directed to transmit a copy of this Memorandum Opinion and Order to counsel of record.

ENTER: June 23, 2006

27

Mary E. Stanley
Mary E. Stanley
United States Magistrate Judge